UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
UNITED STATES OF AMERICA,

**S4 05 Cr. 1067 (KMK)**

       - against -


ROBERTO MONTGOMERY, *et. al.,*

          Defendants.
--------------------------------------------------------X


### MEMORANDUM OF LAW IN SUPPORT OF
### DEFENDANT NARESH PITAMBAR'S MOTION FOR A NEW TRIAL ON
### THE GROUNDS OF NEWLY DISCOVERED EVIDENCE

      Naresh Pitambar ("Pitambar") respectfully submits this Memorandum of Law in support of his application pursuant to Rule 33(a) of the Federal Rules of Criminal Procedure for a new trial in the interest of justice on the grounds of newly discovered evidence.


### PRELIMINARY STATEMENT

      Since Pitambar's trial in April and May 2007, Pitambar has discovered evidence that warrants a new trial.  This evidence was discovered in September 2007 and could not be located prior to Pitambar's April 2007 trial. The newly discovered evidence consists of two separate yet connected items: (1) Natasha Singh's ("Singh") perjury on April 16-17, 2007 at Pitambar's trial before this Court and (2) *Brady/Giglio* material and 3500 material about Singh the government failed to provide during the April 2007 trial despite demands for such material.   The failure of the government to provide this information and material violated Pitambar's Sixth Amendment rights under the Confrontation

Clause. These *Brady* and *Giglio* and 3500 violations also violated his constitutional right to a fair trial and his due process rights under the Fourteenth Amendment. [1]

## FACTS

The indictment in this case charged Pitambar with conspiracy to commit bank fraud, bank fraud and conspiracy to launder money. Pursuant to an arrest warrant Pitambar was arrested on February 9, 2006. Singh was a named defendant in Pitambar's indictment where Singh was arrested in August 2005. Prior to the Court setting an April 2007 trial date, Pitambar requested various items of discovery from the government on May 3, 2006 pursuant to FRCrP 16 as well as *Brady* and *Giglio* material. Exhibit A. In this letter, Pitambar made his *Brady/Giglio* requests continuing for, among other things, any uncharged criminal conduct regarding the government's witnesses. Exhibit A p.4-5. After setting an April 2007 trial date, the Court held a pre-trial conference on March 1, 2007 where the Court, among other things, ordered the government to turn over all the 3500 material to Pitambar on March 30, 2007. After receiving 3500 material from the government, Pitambar continued to make supplemental demands for *Brady* and 3500 material he believed to exist. These further demands focused primarily on the principal and only witness against him: Singh. Exhibit B. The government stated there was none, and the trial proceeded to verdict. As the Court knows, the jury acquitted Pitambar on May 10, 2007 of two of the three counts in the indictment, finding him guilty only of conspiracy to commit bank fraud.

In September 2007, Pitambar became aware that Singh and Douglas Shyne ("Shyne") were referenced in another Southern District indictment regarding a fraudulent check scheme and was going to testify soon in that matter. This indictment is entitled the

---

[1] *Brady v. Maryland*, 373 US 83 (1963) and *Giglio v. United States*, 405 US 150 (1972).

*United States v. Luvenia Bartee, et. al.*, 06 Cr. 832 (KTD) ("Bartee indictment"). Exhibit C. The Bartee indictment was filed on September 20, 2006 by the same prosecutor who filed and tried Pitambar's indictment. Shortly after becoming aware of the Bartee indictment, it became clear to Pitambar the government did not provide any materials regarding Singh's involvement in the Bartee indictment.[2]

Starting on September 24, 2007 at the Bartee trial, Singh testified to the following: in approximately August to September 2004, Singh heard from Shyne that Toybe Bennett "(Bennett") was happy because Bennett "got two goods accounts from Virginia", specifically, UR Recovery ("UR") and Moonlight Productions ("Moonlight"). Bartee Trial Transcript[3] ("BTT") 195. These accounts were willing to deposit fraudulent checks into their business account, and these checks were for $160,000.00 and $85,210.00. BTT 194-8. UR was purportedly a company that repaired individual's credit and credit reports, but Singh did not know what type of company Moonlight was. BTT 196. Singh discovered that the owner of UR was a female because Shyne asked Singh to create a fake invoice for the owner of UR. Id. Singh heard from Shyne that the owner of UR agreed to deposit two counterfeit checks and wanted the fake invoices to protect herself (the owner of UR) if someone were to ask later why these two checks were deposited into UR's business account. BTT 197-201. Singh then describes she created the fake invoice and it is admitted into evidence as government exhibit 402.[4] BTT 201-2.

---

[2] At this juncture, Pitambar requested pursuant to 18 USC §3006A(e) a copy of Singh's future testimony at the Bartee trial.

[3] Only the relevant portions of Singh's testimony at the Bartee trial are attached as Exhibit D since it consists of 205 pages. Pitambar will provide the entire transcript to the Court with a courtesy copy of the instant motion. References to the April-May 2007 trial transcript are abbreviated as "TT".

[4] Government Exhibit 402 is attached as Exhibit E.

While still on direct examination and demonstrating she did not pled guilty to her involvement with the UR invoices, Singh testified at the Bartee trial that her understanding is that her testimony at the Bartee trial is not part of her cooperation agreement. BTT 275-6. Towards the end of her testimony, Singh answers certain questions posed by the government that leave no doubt whether the government knew about Singh's perjury in April 2007. While trying to clear up an issue raised during cross-examination about when she first told the government about her involvement with UR Recovery invoices, Singh clearly stated to the jury on re-direct that she told the government about UR Recovery before the April 2007 trial; in fact, Singh told the government before Singh signed her cooperation agreement. BTT 362-3. None of this material was provided to Pitambar despite it being requested and despite the government recognizing that they have a constitutional obligation to provide this type of material. Exhibit F[5]. Therefore, the government's failure to provide this material clearly warrants a new trial.

## ARGUMENT

### THE GOVERNMENT'S FAILURE TO DISCLOSE SINGH'S INVOLMENT IN THE SECOND INDICTMENT AND SUBSEQUENT PERJURY REQUIRES A NEW TRIAL UNDER RULE 33

Pursuant to Rule 33(a) of the Federal Rules of Criminal Procedure, the court may grant a motion for new trial based on newly discovered evidence "if the interests of justice so require." FRCrP 33. The relevant factors to be considered are whether: (1) counsel could not have discovered the evidence with due diligence before or during trial;

---

[5] Exhibit F is an 4/10/07 letter from the government to counsel where they recognize their obligations under *Giglio v. United States* and they provided *Giglio* material for five witnesses (and alleged co-conspirators) whom the government was not calling as witnesses on their case.

(2) the new evidence is material; and (3) the new evidence is not cumulative. *United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005); *See United States v. Middlemiss*, 217 F.3d 112, 122 (2d Cir. 2000); *United States v. White,* 972 F.2d 16, 20-21 (2d Cir.1992). Furthermore, when a defendant claims that a government witness committed perjury in the context of Rule 33, the defendant must first establish the testimony of the witness was actually false. *United States v. Moore*, 54 F3d 92, 99 (2d Cir. 1995). Once the perjury is established, the materiality standard depends on whether the government knew or should have known about the perjury committed by their witness. *United States v. Moore*, 54 F3d 92, 99 (2d Cir. 1995)

When the government knew or should have known that its witness committed perjury at trial, the standard is whether there is "any reasonable likelihood" that the false testimony influenced the jury's verdict. *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991). In such cases, reversal is "virtually automatic." *Id. (quoting United States v. Stofsky*, 527 F.2d 237, 243 (2d Cir. 1975)). "The intentional governmental suppression of evidence useful to the defense at trial will mandate a virtual automatic reversal of a criminal conviction. *See, e.g., Moore v. Illinois*, 408 U.S. 786, 797-98, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972); *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *United States v. Sperling*, 506 F.2d 1323, 1333 (2d Cir. 1974), *cert. denied*, 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975)". *Stofsky* at 243. Since at least 1935, it has been the established law of the United States that a conviction obtained through testimony the prosecutor knows to be false is repugnant to the Constitution. *See Mooney v. Holohan,* 294 U.S. 103, 112, 55 S.Ct. 340, 79 L.Ed. 791 (1935). This standard applicable to the

knowing introduction of false testimony serves the dual purposes of discouraging prosecutorial misconduct and providing relief from an unfair conviction. *United States v. Agurs*, 427 U.S. 97, 104, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

If, on the other hand, the government had no actual or constructive knowledge of the perjury, a new trial should be granted if the court believes that "but for the perjured testimony, the defendant would most likely not have been convicted." *Sanders v. Sullivan*, 863 F.2d 218, 226 (2d Cir. 1988); *see United States v. Damblu*, 134 F.3d 490, 493 (2d Cir. 1998) (applying a higher materiality standard where there is no allegation that the government knew of the perjury).

In *Wallach,* the defendants appealed their convictions for racketeering, mail fraud, interstate transportation of stolen property, and conspiracy to violate the federal conflict of interest law. *Wallach*, 935 F.2d at 449.  The Court of Appeals held that perjury of government witness required reversal of all convictions and remanded the case for a new trial. *Wallach*, 935 F.2d at 473.  In so holding the Court of Appeals found that:

> Guariglia was the centerpiece of the government's case. Had it been brought to the attention of the jury that Guariglia was lying after he had purportedly undergone a moral transformation and decided to change his ways, his entire testimony may have been rejected by the jury.  It was one thing for the jury to learn that Guariglia had a history of improprieties; it would have been an entirely different matter for them to learn that after having taken an oath to speak the truth he made a conscious decision to lie.

*Wallach*, 935 F.2d at 457.

In *Wallach*, the Second Circuit granted a new trial based upon the perjury committed by the principal witness Guariglia on the collateral matter of the Guariglia's gambling activities since the government should have known that Guariglia was not

telling the truth.  Here, Singh is the only witness against Pitambar, and she committed perjury at Pitambar's trial regarding her overall involvement in her scheme with Shyne. On April 17, 2007 during cross-examination, Singh stated the following:

> 12  Q.  How many other checks did you -- big checks did you
> 13  participate with Shyne and Toybe?
> 14  A.  I don't know the number.  I don't remember.
> 15  Q.  You pled guilty to all of them, didn't you?
> 16  A.  Yes.  But I don't remember the back of my head the total
> 17  amount of the checks.  It's a lot.  I don't remember. TT.499

Singh committed perjury when she told Pitambar's jury that she pled guilty to all of the checks.  As we now know from the Bartee trial, Singh created fake invoices with respect to the two checks that are the subject of the Bartee indictment, but she never pled guilty to her involvement in that scheme with those invoices and checks.  The invoices and checks relevant to the Bartee indictment are not referenced in Singh's plea allocution (3512A), the information she pled guilty to (3512B), or her cooperation agreement (3512C).[6]  Clearly, based upon the government's re-direct in the Bartee trial, the government knew about Singh's fraudulent activity surrounding UR before signing her cooperation agreement, and thus, before Pitambar's trial.  Even Singh's understanding is that her involvement with the UR invoices is not covered by her cooperation agreement. BTT 275-6.  Thus, Pitambar was not able to cross-examine Singh about this topic or the relevant topic that the government (or an agent of the government) has made another promise to Singh about the crimes she committed with the UR invoices.  Furthermore, the jury was left with the false impression that Singh pled guilty to all of her criminal activity when in fact she did not.  "[W]hen the reliability of a particular witness may be

---

[6] Pitambar presumes the Court was provided a copy of the 3500 material and thus, he is not attaching these documents as exhibits.

determinative of innocence or guilt, a 'new trial is required if the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . .'" *United States v. Seijo*, 514 F2d 1357, 1364 (2d Cir. 1975), *quoting Giglio, supra*. Singh was such a witness.

Pitambar could not discover this indictment on his own.  Pitambar's counsel checked Singh's name through the district court's public access system, PACER.  The Bartee indictment did not appear during this search.  Furthermore, this new evidence is material and non-cumulative because it demonstrates Singh's propensity to lie and her complete disregard for the oath to tell the truth, just like *Wallach*.  Clearly, her actual perjury at the Bartee trial could not have bee discovered prior to April 2007, and perjury of the government's principal witness is never cumulative or immaterial.  This Bartee trial testimony and the *Giglio* material about UR also demonstrates Singh had a different role in the fraudulent check scheme then she indicated to the jury during Pitambar's trial and the lengths of deceit to which she went to perpetrate the fraud. However, the government's failure to disclose this material precluded Pitambar from confronting Singh on this topic.

Moreover, Singh admitted during Pitambar's trial that in 2004 she had been arrested by a Pennsylvania detective for a depositing a counterfeit check into her bank account. TT 306-09.  She further testified that Shyne generated a fake business invoice in the name of New York Café Lounge, a company the two co-owned, to deceive law enforcement into believing that the check was received as a result of a legitimate business transaction for services rendered. TT 308.   This fake invoice provided to the

Pennsylvania detective to show Singh was a "victim", and her state case was dismissed. TT308. This invoice was admitted as a defense exhibit.[7] Exhibit G.

After comparing the fake invoice provided to Pennslyvania law enforcement and the fake UR invoices Singh admitted to generating with respect to the $160,000.00 and $85,210.00 counterfeit checks, it appears that Singh perjured herself again when she stated that Shyne's handwriting is on the fake invoice provided to Pennslyvania law enforcement.  First, the invoices' format is absolutely identical.  Second, the dates of these invoices are only several weeks apart: the UR invoices are dated 11/16/04 and 11/27/04 while the Pennsylvania invoice is dated 10/22/04, giving rise to the inference Singh actually created all of them.  Third and most importantly, some (if not all) of the handwriting on the UR invoices she admitted to creating appears to be the same as the one Singh claims Shyne created.  At the very least, Pitambar should have been permitted to confront Singh on these topics, and the jury would then determine whether her answers were credible or not.

Most important, the government denied Pitambar the right to confront Singh about what, if any, promises were made to her about being prosecuted for the UR invoices.  Pitambar does not know if there were any promises, but this line of cross-examination is completely permissible. *See Giglio v. United States, supra.*  As Singh acknowledges that she did not believe her involvement in the UR invoices was not covered in her plea agreement, Pitambar was denied the opportunity to cross her about whether she had been promised immunity, for instance.  Singh clearly committed another crime that she did not allocute to in her plea minutes, and she clearly committed perjury

---

[7] This was admitted by Steven Riddick's counsel as SRR.  I have attached an exact copy of that exhibit to the Exhibit G.

when she stated she pled guilty to all the fraudulent checks she participated in. As Singh's testimony at the Bartee trial makes clear, the government knew about her involvement in the UR invoices before Pitambar's trial began. Also, the Second Circuit has recently held that "[w]hen the Government is in possession of material information that impeaches its witness or exculpates the defendant, it does not avoid the obligation under *Brady/Giglio* to disclose the information by not writing it down." *United States v. Rodriguez*, 496 F3d 221, 222 (2d Cir. July 2007).

The jury clearly had some credibility concerns with Singh as they acquitted Pitambar of two of the three counts. Had Pitambar been able to confront Singh, the principal witness against him, with the UR invoices and the fact the government did not make her pled guilty to them, there is "reasonable likelihood" Pitambar would have been completely acquitted. This line of cross would have lead to the permissible inference that Singh will say anything since the government is excusing some of her criminal conduct. The government cannot deny that they were in possession of this new evidence because Singh testified on re-direct during the Bartee trial that prior to signing a cooperation agreement with the government in March 2007 that she had informed them about the fake invoices she generated on behalf the owner of UR Recovery for the deposit of the $160,000.00 and $85,210.00 counterfeit checks into the company's bank account. BTT 362-3. Furthermore, while the government acknowledged they understand their *Brady/Giglio* obligations (Exhibit F), this Court warned the government of the perils of not complying with *Giglio* and *Brady* during the course of this very trial. TT 175-183. Instead of following the Court's advice, the government chose not to provide this material and then called Singh a truthful witness during summation when they know she

lied in Court about pleading guilty to all the fraudulent checks she participated in.  TT 3316-8.  Based upon all these reasons, Pitambar constitutional rights were violated, and the Court should grant his Rule 33 motion for a new trial.

## **CONCLUSION**

For foregoing reasons, Pitambar respectfully requests a new trial pursuant to Rule 33(a) of the Federal Rules of Criminal Procedure, and any other relief the court deems proper.

Dated: New York, NY
        November 8, 2007

                  KELLEHER & DUNNE LLP
                  *Attorneys for Naresh Pitambar*

                  By: _____/s/_____
                      Denis P. Kelleher (DK 1414)
                      17 Battery Place, 11th Fl.
                      New York, NY 10004
                      (212) 825-1700