EXHIBIT D

EXHIBIT D

7909BART1          Trial

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4          v.                    06 CR 832 (KTD)

5    LUVENIA BARTEE and EBONY WORTHY,

6          Defendants.

7    ------------------------------x

8                              New York, N.Y.
                               September 24, 2007
9                              2:15 p.m.

10   Before:

11                        HON. KEVIN THOMAS DUFFY

12                        District Judge

13                        - and a jury -

14                        APPEARANCES

15   MICHAEL J. GARCIA
          Acting United States Attorney for the
16        Southern District of New York
     BY:  DANYA PERRY
17        DANIEL LEVY
          Assistant United States Attorneys
18
     MARTIN R. STOLAR
19        Attorney for Defendant Bartee

20   HOWARD L. JACOBS
          Attorney for Defendant Worthy
21

22   Also Present:  Ruben Correa
                    Special Agent
23                  Immigration and Customs Enforcement

24                  Robert Arnay
                    Paralegal, U.S. Attorney's Office
25

79OABAR2ps                    Opening - Mr. Jacobs

1    something wrong.  And I point out to you, the records will show

2    that money was drawn out of the account from only one check

3    that was deposited in the account.

4          Listen to all of the evidence, as the Judge has told

5    you, listen not only to the direct testimony, but to the

6    cross-examination of every witness, to determine for yourselves

7    where the truth lies in this case.  And I'm sure you will then

8    follow your oath and give Ebony Worthy a fair and just trial in

9    this case.  Thank you.

10         THE COURT:  OK.  Call your first witness.

11         MS. PERRY:  Your Honor, the government calls Natasha

12   Singh.

13    NATASHA SINGH,

14        called as a witness by the government,

15        having been duly sworn, testified as follows:

16         MS. PERRY:  May I inquire, your Honor?

17         THE COURT:  Yes.

18    DIRECT EXAMINATION

19    BY MS. PERRY:

20    Q.   How old are you, Ms. Singh?

21    A.   32 years old.

22    Q.   What do you do for a living?

23    A.   Currently I'm in school.

24    Q.   For what?

25    A.   Nursing.

7909BART3                    Singh - direct

1   involved in this fraudulent check scheme, do you know how much

2   money was made from these bad checks?

3   A.   Yes.  He made a lot of money.  Oh, in the millions.

4   Q.   Ms. Singh, have you ever heard of a company called UR

5   Recovery?

6   A.   Yes, I did.

7   Q.   How did you first hear about this company?

8   A.   Well, I heard about it from Douglas.  But I heard there was

9   accounts in Virginia from Toybe when I first heard about.

10  Q.   What did Toybe tell you?

11  A.   Well, he didn't say exactly to me.  He was helping me move

12  and he and his cousin were having a conversation, and I was

13  right there in the next room.

14  Q.   Who was his cousin?

15  A.   Roberto Montgomery.

16  Q.   And is Roberto Montgomery someone that you mentioned

17  earlier, someone that Toybe worked with in depositing bad

18  checks?

19  A.   Yes.

20  Q.   And when was this conversation between Roberto Montgomery

21  and Toybe Bennett?

22  A.   It was around August of 2004, in my house, they were

23  helping me move.  And Roberto said to Toybe:  All these things

24  you have me doing for you, you really owe me.

25       And Toybe said to him that:  Don't worry.  I got you.

7909BART3                    Singh - direct

1   My deal is going to come through soon, and I'll take care of

2   you.

3   Q.  And what was the next thing you heard about this Virginia

4   deal?

5   A.  A few days later Douglas was talking to Toybe on the phone.

6   And when he hang up, he said that ooh, Toybe is very happy that

7   he got two good accounts from Virginia, and then he told me the

8   names.

9   Q.  And he told you the names of the two -- I'm sorry.  Could

10  you say that again.  What did he tell you?

11  A.  He said Toybe was very happy because he got two good

12  accounts from Virginia.

13  Q.  Did he tell you what those two accounts were?

14  A.  Yes.

15  Q.  And what were they?

16  A.  It was UR Recovery and Moonlight Production.

17  Q.  What was the expression he used, a good account?

18  A.  Yes.  He used that a lot.

19  Q.  What does that mean, good account?

20  A.  He found someone that's willing to deposit these checks in

21  their name; and also if they have a business account, it's even

22  better for them.

23  Q.  Did Douglas tell you how Toybe Bennett knew these people in

24  Virginia who had these good accounts?

25  A.  Yes, through a friend of his, I understand it's a mutual

7909BART3                    Singh - direct

1   friend in Brooklyn.

2   Q.   Did Douglas tell you what type of business UR Recovery is?

3   A.   Yes.

4   Q.   What kind of business was it?

5   A.   A business that repairs credit, people's credit.

6   Q.   Did you know what type of business Moonlight Productions

7   was?

8   A.   No.

9   Q.   Did you learn who owned UR Recovery?

10  A.   I learned it was a female.

11  Q.   Do you recall the person's name?

12  A.   No.

13  Q.   How did you learn that the owner of UR Recovery was a

14  female?

15  A.   Because Douglas mentioned that he needs a fraudulent

16  statement, a fake invoice to be sent to -- she's going to need

17  a fake invoice to be sent.

18  Q.   So he used a female pronoun?

19  A.   Yeah.  He said she.

20  Q.   Did you learn who owned Moonlight Productions?

21  A.   A couple.

22  Q.   Did you know their names?

23  A.   No.

24  Q.   There was a couple.  Did you know it was the wife, the same

25  person that owned UR Recovery?

7909BART3                     Singh - direct

1    A.   No.  It was two different people.

2    Q.   By the way, you said that the first time you heard about

3    the two accounts in Virginia you thought was when?

4    A.   From Toybe in September.

5    Q.   September?

6    A.   Mm-hmm.

7    Q.   And then you later heard Douglas about the conversation?

8    A.   Yes.

9    Q.   Were you aware how many counterfeit checks the owner of UR

10   Recovery agreed to deposit?

11   A.   Yes.

12            MR. STOLAR:  Objection.  I object to the question.

13            THE COURT:  She said yes.

14            MR. STOLAR:  Well, it's the question.  The owner

15   agreed to deposit, and that presumes a fact that is not in the

16   testimony.

17            THE COURT:  Well, I'll permit anyway.  Go ahead.

18   Q.   Did Douglas tell you that the owner of UR Recovery agreed

19   to deposit counterfeit checks?

20   A.   Yes.

21   Q.   Were you aware how many counterfeit checks that owner of UR

22   Recovery agreed to deposit?

23   A.   Yes.

24   Q.   How many?

25   A.   Two.

7909BART3                       Singh - direct

1   Q.   Were you aware of how big those checks were?

2   A.   Yes.

3   Q.   Do you recall how big they are?

4   A.   One is for 80 something thousand and one is a hundred and

5   change -- a hundred and something thousand.

6   Q.   Were you aware of where those two counterfeit checks were

7   deposited by UR Recovery?

8   A.   Yes.

9   Q.   Where was that?

10  A.   One in Philadelphia and one in New York.

11  Q.   Who deposited those checks?

12  A.   Toybe and Douglas.

13  Q.   Who told you that?

14  A.   Douglas.

15  Q.   Did Douglas ever tell you whether he ever got any proceeds

16  from these two checks deposited in UR Recovery's account?

17  A.   Yes.

18  Q.   What did he tell you about the proceeds?

19  A.   He said to me that he needs these fake invoices to be made

20  up because she does not want to release anymore money until she

21  receives the fake invoices.

22  Q.   I'm going to get back to the fake invoices.  I'll ask you

23  first, did you hold any accounts at Wells Fargo?

24  A.   Yes, I did.

25  Q.   What type of account?

7909BART3                        Singh - direct

1    A.   It was a credit line under the business name.

2    Q.   Which business name?

3    A.   New York Cafe Lounge.

4    Q.   How much was the line of credit for?

5    A.   I believe it was 50,000; 45, 50,000.

6    Q.   Who applied for the line of credit?

7    A.   I did.

8    Q.   Was Douglas Shyne on this account?

9    A.   No.  Douglas never applied for anything.  He was never

10   on --

11   Q.   Did you have any credit cards on this account?

12   A.   Yes.  There was two credit cards.  One would come out

13   because I'm the applicant and I requested one for him, for

14   Douglas, without him filling out any application for a credit

15   check.  He had a $45,000 or $40,000 credit spending limit off

16   of the card that I applied for, and I had five thousand.

17   Q.   Now, did you and he ever pay down this line of credit?

18   A.   He told me that he was going to pay the line of credit

19   because he had made a lot of purchases and he was going to pay

20   it from proceeds from the Virginia deal.  I don't know which

21   one it was.

22   Q.   Are you aware -- did he pay off this line of credit on

23   other occasions besides during the course of this Virginia

24   deal?

25   A.   He's paid it off before.  He run it up, and he keeps doing

7909BART3                    Singh - direct

1   that over and over.

2   Q.   With what funds does he pay off the line of credit?

3   A.   From fraudulent proceeds.

4   Q.   Why does he use fraudulent proceeds to pay down this line

5   of credit?

6   A.   To have it not traced to him because the card is not in his

7   name.  It's in my name.

8   Q.   There is a card in his name with you?

9   A.   Yeah, he got a card in his name.  But he didn't have to

10  apply for it with a social security number or anything.  So

11  when he makes a payment, it goes because I'm the applicant.  If

12  he doesn't pay it, they coming after me.

13  Q.   Did you hear about any problems that Douglas Shyne was

14  having with UR Recovery?

15  A.   Yes.

16  Q.   In what context did you hear this?

17  A.   The problem when he asked me for an invoices, when he said

18  she wants the fake invoices sent to her before she release any

19  further money.

20  Q.   Who is the "she" that wanted the fake invoices?

21  A.   He referred to the owner of UR Recovery.

22  Q.   And he asked you to provide some fake invoices?

23  A.   Yes.

24  Q.   Did he tell you why the owner of UR Recovery wanted these

25  fake invoices?

7909BART3                        Singh - direct

1   A.  To cover herself, God forbid the checks come back, to show

2   that she provided this service to whoever I would make up the

3   fake invoices for.

4   Q.  Was this the first time that you and Douglas Shyne had

5   discussed invoices for UR Recovery?

6   A.  No.  A few days earlier he had mentioned to me that he

7   would need these invoices for UR Recovery.  And then later on

8   he mentioned that she needs it because she's not going to send

9   any additional funds.

10  Q.  So to your understanding the checks had already been

11  deposited and some of the funds were released but not all the

12  funds?

13  A.  Correct.  And she's requesting the fake invoice to release

14  the balance.

15  Q.  I'd like to ask you to look at what's been marked for

16  identification as Government Exhibit 402 and ask if you

17  recognize that?

18          MS. PERRY:  Your Honor, just to let you know, this

19  will probably take a little while with this invoice.  Should we

20  go forward?

21          THE COURT:  This is exhibit 402?

22          MS. PERRY:  Yes, your Honor.

23          THE COURT:  You can identify it.

24  Q.  Can you identify Government Exhibit 402?

25  A.  Yes.

7909BART3                        Singh - direct

1   Q.  What is that?

2   A.  This is an invoice I made up and give it to Douglas.

3   Q.  Is this your handwriting on these two documents, that's

4   Government Exhibit 402?

5   A.  Yes, it is.

6   Q.  When you prepared the fake invoices, I assume you prepared

7   them -- let me -- withdrawn.

8          Government Exhibit 402 that's in front of you, is that

9   an original document?

10  A.  No.  It's copies.

11  Q.  But this is a copy of what you prepared?

12  A.  Yes.

13          MS. PERRY:  The government offers exhibit 402.

14          MR. STOLAR:  Can I take a look?

15          THE COURT:  Sure.

16  BY MR. STOLAR:

17  Q.  On top of one of these copies there is some, what looks

18  like pen language.  Do you know what that is?

19  A.  No.

20  Q.  You didn't write that?

21  A.  No.

22          MR. STOLAR:  Judge, if we can get an agreement to

23  block out the stuff that she doesn't recognize.

24          THE COURT:  Sure.

25          MS. PERRY:  Yes, your Honor.

7909BART3                    Singh - direct

1              MR. STOLAR:  Then I won't have an objection.

2              THE COURT:  Okay.  Now, you're going to take time with

3    it tomorrow.  At least it will be in evidence.

4              (Government's Exhibit 402 received in evidence)

5              THE COURT:  All right, Ladies and Gentlemen, I'll see

6    you tomorrow afternoon.  Sorry, but I got to do it this way.

7    All right.  Good.  Have a pleasant evening.

8              (Jury excused)

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

79P9BART3                    Singh    direct

1   Q.  In connection with your guilty plea in your case, did you

2   agree to forfeit any asset to the government?

3   A.  Yes, I did.

4   Q.  What did you forfeit?

5   A.  Everything I worked for and everything that I got from

6   fraudulent proceeds.

7   Q.  Do you have any assets remaining?

8   A.  Just myself and my kids.

9   Q.  Do you still live in your house in New Jersey?

10  A.  No, I don't.

11  Q.  Was your guilty plea in your case pursuant to a cooperation

12  agreement with the government?

13  A.  Yes.

14  Q.  Are you testifying today pursuant to that cooperation

15  agreement?

16  A.  No.

17          MR. STOLAR:  I'm sorry?

18  Q.  What's your understanding of what you had to do under the

19  agreement, your cooperation agreement?

20  A.  Tell the truth.

21  Q.  And what's your understanding of what the government was

22  required to do under the agreement?

23  A.  Give a letter to the judge.

24  Q.  A letter to the judge saying what?

25  A.  Saying if I -- if they found me being truthful or not.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

79P9BART3                    Singh - direct

1   Q.  And what's your understanding of what would happen if you

2   were not to tell the truth, you were to not tell the truth?

3   A.  The government will then rip the letter up, the agreement

4   letter.

5   Q.  Is it your understanding that you are required to tell the

6   truth in all matters for the government?

7           MR. JACOBS:  Objection, leading.

8           THE WITNESS:  Yes.

9           THE COURT:  Sure is.

10  Q.  You're not testifying today, it's your understanding,

11  pursuant to your cooperation agreement?

12  A.  No.

13  Q.  Why are you testifying today?

14  A.  Because the government knows that I -- have knowledge of

15  some information of this case and I have to tell the truth.

16  Q.  Has the government made any promises to you about what

17  sentence you might receive if they choose to write a letter to

18  your sentencing judge?

19  A.  No.

20  Q.  Who decides what sentence you receive?

21  A.  The judge.

22          THE COURT:  This judge is not me, right?

23          THE WITNESS:  No, sir.

24          MS. PERRY:  Your Honor, may I just have one moment?

25          THE COURT:  Sure.

79Q9BART2                         Singh - redirect

1              MR. JACOBS:  Nothing to do with cross.

2              THE COURT:  Sustained.

3              MS. PERRY:  Well, Mr. Jacobs asked a question about --

4              THE COURT:  No.

5              MS. PERRY:  I'll move on.

6              THE COURT:  No.  No.

7    Q.  You testified on cross about numerous individuals

8    associated with Toybe Bennett who had deposited checks into

9    their account.  You talked about a Jason Watler, Roberto

10   Montgomery.  You testified on direct about a girlfriend of his,

11   Donna.

12             Are these all people who put proceeds of counterfeit

13   checks, or did they put counterfeit checks themselves, if you

14   know?

15   A.  Both.

16   Q.  To your knowledge, did these people do so knowing that the

17   checks were bad?

18             MR. JACOBS:  Objection.

19             THE COURT:  Sustained.

20   Q.  Did Toybe ever tell you whether his girlfriend, Donna, knew

21   that she was putting bad checks in for him?

22             MR. JACOBS:  Objection.  Improper redirect.

23             THE COURT:  Yes.  Has nothing to do with the cross.

24   Q.  You were just asked some questions by Mr. Stolar about what

25   you told the government and when you told them.  How many

79Q9BART2                        Singh - redirect

1  meetings have you had with the government?

2  A.   Several.

3  Q.   And do you know whether notes were taken at each of these

4  meetings?

5  A.   No.  A lot of times they didn't take notes.

6  Q.   And the documents that he showed you and asked if they

7  refresh your recollection, do you know what those are?

8              MR. STOLAR:  Objection.

9              THE COURT:  No.  Does she know.

10             THE WITNESS:  Yes.

11 Q.   What are they?

12 A.   Those are the notes from our meeting in our early stage.

13 Q.   Did you take those notes?

14 A.   No.

15 Q.   Had you ever seen those notes before?

16 A.   No.

17 Q.   Do you know whether they contained everything that was

18 discussed in that meeting?

19 A.   I don't know.  I was talking.  Somebody was writing.  I

20 don't know if they could write as fast.  I don't know.

21 Q.   Prior to signing a cooperation agreement with the

22 government in March of 2007, had you told the government about

23 fraudulent activity relating to UR Recovery?

24 A.   Yes.

25 Q.   Had you told the government about fraudulent activity

79Q9BART2                    Singh - redirect

1    relating to people associated with Toybe Bennett?

2    A.  Yes.

3    Q.  Did you tell the government specifically and did you

4    mention any names?

5    A.  I told the government about UR Recovery.

6            MR. JACOBS:  Objection.  The answer is did you mention

7    any names.  Yes or no.

8            THE COURT:  Yes.  And she said yes.

9            THE WITNESS:  Yes.

10           THE COURT:  Okay.  Next question.

11   Q.  What names did you tell the government?

12   A.  I mentioned to the government that they did deals with UR

13   Recovery, Moonlight, and also I mentioned about Toybe involving

14   friends, family, and girlfriends.

15   Q.  When you were asked specific questions by the government

16   about people's names, did you answer those questions at that

17   point?

18   A.  Yes, whatever the government asked me, whatever name, I

19   gave, yeah.

20   Q.  Whether or not -- withdrawn.

21           MS. PERRY:  I think I'm done, your Honor, just one

22   minute.

23           (Pause)

24           MS. PERRY:  No further questions, your Honor.

25           MR. JACOBS:  No recross, your Honor.